UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | |
|---|---|
| MCDONOUGH MARINE SERVICES, A DIVISION OF MARMAC, L.L.C. | CIVIL ACTION |
| VERSUS | NO: 04-2145 |
| CORE INDUSTRIES, INC. | SECTION: "S" (2) |


### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, McDonough Marine Service ("McDonough"), has sued defendant, Core Industries, Inc. ("Core"), for damages to its barge KS-554, alleging that Core breached the terms of charter party L-1216 covering the barge by failing to perform maintenance or to discover and repair damage incurred during the charter. Core argues that any damages to the barge were fair wear and tear,[1] sustained in the normal course of the six-year contract, and made worse because the barge was not fit for its intended use at the inception of the charter.

---

[1] Fair wear and tear of a vessel is the normal depreciation or natural decay resulting from the use for which the vessel was intended. *See The Darien Bank v. Travelers Indemnity Co.*, 654 F.2d 1015, 1020 (5th Cir. 1981).

Core is a materials-handling and marine construction company.  Since the 1980s, Core chartered deck barges from McDonough more than 35 times.  In August 1997, Core chartered the KS-554 from McDonough for use in its materials operations.  The charter lasted until September 2003.

**A.   The charter party.**

The August 20, 1997 charter L-1216 of the KS-554 from McDonough to Core was similar to previous charters between the parties.[2]  The contract specifically provides:  "Delivery to and use by [Core] of the barge, which may include any actions taken by [Core] under any provision of this charter, establishes conclusively that all of the terms and conditions of this Barge Bareboat Charter Party are in effect."  Although Core did not sign the written charter, Core accepted delivery of the barge and paid the amounts set forth in the charter party over the course of six years.

In the charter party, Core agreed either to inspect the barge, or to waive inspection and acknowledge that the barge was in good and seaworthy condition.  The charter also provided that Core was not entitled to make or assert any claim against McDonough "on account of any representations or warranties,

---

[2]Exhibit "2".

expressed or implied, with respect to the condition of the barge." All costs and expenses incident to the use and operation of the barge, including any collision damage,[3] were to be paid by Core. Core further agreed to maintain the barge in a good, seaworthy condition during the term of the charter and to return the barge in the same good, seaworthy and clean condition as when it was received, fair wear and tear excepted. Further, if McDonough incurred any expenses of repairs or cleaning the barge to put it in the same good, seaworthy and clean condition as upon delivery, Core was to be responsible for said expenses, and was required to pay charter hire until the date the barge was returned. The charter party also provided for attorneys fees, expenses, and costs for enforcing the agreement. The charter hire, with a base term of twelve months, was $5,750.00 per month.

**B.  Core's use of the KS-554.**

The KS-554 is a steel deck barge built in 1989. It is 120 feet long by 55 feet wide and 7 feet deep. The barge has a flush deck, square raked bow, transom stern, and a total of 15 compartments. The KS-554 is an undocumented inland barge and is not subject to annual inspection. The barge has a life span of

---

[3] During the pendency of the charter, the KS-554 collided with two vessels. Core made the necessary repairs to the KS-554 after each collision.

approximately 25 to 30 years, with a work life expectancy in brackish waters of approximately 16 to 20 years.[4]  McDonough advertised the KS-554 as being suitable for a 250-ton lift crane, which requires the barge to be capable of supporting at least 500 tons.

John Watson, Operations Manager for Core, contacted Eric Anderson at McDonough and requested a barge that was capable of being used as a material-handling barge.  Watson described to Anderson the size and type of crane to be employed on the barge.  McDonough advised that the KS-554 was available and suitable for Core's intended use.[5]

Core used the barge with its 220-ton duty-cycle crane as a work platform.  It used a grab bucket to move cargo, primarily rock, from other barges or ships to land.  Core never transported or loaded cargo onto the barge.  Crane mats were used underneath the crane to aid in distributing the crane's weight and to protect the deck plate.  The mats were replaced by Core in 2000, and the old mats were used as added protection for the deck plating.[6]  At no time during the charter did the crane, its grab

---

[4]Testimony of Patrick Webb.

[5]Testimony of John Watson.

[6]The replacement mats, which are serviceable, became tattered with use.  However, they were still in use on another

bucket, and cargo exceed 250 tons.

Under normal use, the barge came into contact with other barges.  The KS-554 did not have rub rails or any kind of bumpers, which witnesses for both parties testified is not uncommon, because bumpers or rails are frequently sheared off when a crane barge comes into contact with a materials barge.[7]

There are no project records which show how the KS-554 was used during the charter.  There are no maintenance records to show Core's maintenance of the barge.  Core has no personnel designated to perform inspections of chartered barges.[8]

**C.   The KS-554's condition upon its delivery to Core.**

At the inception of the charter, before the KS-554 was delivered to Core, McDonough hired Bachrach & Wood to perform an on-charter survey of the barge to determine its pre-charter condition.[9]  The survey was performed by Kevin Jacomine on August 19, 1997.  Jacomine's report noted damage to the barge that was consistent with the on-charter survey, performed by Captain R.T.

---

vessel at the time of trial.

[7]According to the testimony of Kevin Jacomine on behalf of McDonough, and Webb on behalf Core, approximately 50 percent of barges similar to the KS-554 do not have rub rails or bumpers.

[8]Deposition and trial testimony of Morgan Myles, President of Core.

[9]Exhibit "3"; *see also* Exhibit "11" diagraming the condition of the barge during the on-charter survey.

Woodruff of M.H. Barrie & Associates on Core's behalf on August 27, 1997.[10]

The damage noted in the on-charter surveys by Jacomine and by Captain Woodruff, include "distortions of internal strength members." With a few exceptions of "heavy" damage, the surveys primarily note "light" to "moderate" damage both internally and externally. For example, the surveys note several deflections in the barge's side shell at several points in the starboard and port sides, and wash boarding on the deck plating.

**D.  The KS-554's condition upon its return to McDonough.**

David Hanby, Jr., President and Chief Operating Officer of McDonough, asserted that the barge's condition at the conclusion of the charter in September 2003 could only be the result of misuse. McDonough hired Bachrach & Wood to perform an off-charter survey on its behalf. Allen Eschette surveyed the barge while it was still in service on August 20, 2003, and documented a substantial amount of damage to the barge.[11] Eschette testified that he believed the damage to the barge was due to contact with other barges during operations. Eschette testified that the damage was more than fair wear and tear during the

---

[10] Exhibit "13(A)".

[11] Exhibit 4.

charter.

Core hired M.H. Barrie & Associates to perform an independent off-charter survey. The survey was performed on August 21, 2003, by Patrick Webb, who testified that the damage to the KS-554 was a result of the fair wear and tear during Core's legitimate use of the barge. Webb testified that the number of damaged items on the barge, as noted in all of the pre-charter surveys, compromised the structural integrity of the barge for the use Core intended. He further noted that once the integrity of the deck and shell of the barge were compromised, any force thereafter, even normal wear and tear, aggravated the already existing damage.

According to Webb, the absence of routine maintenance and inspections resulted in the failure to discover and remedy much of the structural wear and tear which was evident by the end of the charter. Ultimately, Webb's testimony was that the KS-554 was not properly constructed for the use for which it was advertised.[12]

Concerning damage to the KS-554's deck plate, Webb testified that the dropping of aggregate on the deck might have caused some damage. He also stated that the crane's grab bucket being

---

[12]Testimony of Webb.

7

slammed down on the deck could have caused damage.  However, Webb testified that it was his opinion that such impacts likely would have only aggravated already existing damage.  Webb also testified that, in his opinion, the matting used for the crane operations were adequate and did not contribute to the barge's deterioration.[13]

**E.   Breach of contractual obligations.**

McDonough alleges that Core breached the terms of the charter party by failing to maintain and return the barge "in the same good, seaworthy and clean condition as when the barge was received, fair wear and tear excepted."[14]  Core argues fair wear and tear and unfitness for its intended use caused the deterioration of the barge.

Under the terms of the charter, Core had a duty to maintain and repair the barge during the charter to minimize any existing damage and prevent unnecessary additional damage.

The evidence at trial established that Core did not properly inspect and maintain the KS-554 during the pendency of the charter.  Webb, Core's own expert, testified that a lack of routine inspections and maintenance resulted in the failure to

---

[13]Testimony of Webb; Exhibit "13(D)".

[14]Exhibit "1".

discover and remedy the areas of structural deterioration and inadequacies of the barge. According to Webb:

> Under a typical annual routine condition inspection and repair program, a barge owner would have discovered and repaired these structural inadequacies. This would be a typical industry standard procedure that would monitor and correct any problems with the barge's structure and related integrity on a routine basis. It would now be apparent that this practice was not followed for this particular barge.[15]

Webb also testified that the damages to the KS-554 were caused by the condition of the barge, its construction, structural inadequacies, and preexisting and advanced deterioration, indicating that the barge was not suitable for the service as represented by McDonough. Because of the prior relationship with Core, McDonough knew that Core needed a crane barge which was structurally sound, and that the KS-554 could not be used as a crane barge without sustaining more than normal deterioration.

Under the terms of the charter, Core took delivery of the KS-554 in its current condition, acknowledging that the barge was in a good, seaworthy condition and in all respects fit for the service intended. Core used the barge without any problems for six years. The charter is clear that Core "agree[d] to maintain the barge in a good and seaworthy condition during the terms of

---

[15]Exhibit "13(F)". *See also,* Exhibit "13(G)".

the charter, and [would] return same to [McDonough] in the same good, seaworthy and clean condition as when the barge was received, fair wear and tear excepted."

The court finds that Core breached its obligation under the charter party to discover and repair the damage, and to perform maintenance during the charter, which would have minimized the extensive deterioration of the barge.  Further, McDonough breached its obligation to furnish a barge fit for its intended use.  This breach contributed to the extent of the damages existing at the conclusion of the charter, in that the barge deteriorated at an accelerated pace.  The court concludes that Core is liable for 60 percent of the damages to the barge because of its failure to discover and repair the damage, and to perform maintenance during the charter, and McDonough is liable for 40 percent of the damage because it furnished a barge the was unfit for its intended use.

**F.   Damages.**

The charter party provides:  "If on return of the barge [McDonough] is put to any expense of repairs or cleaning of the barge to put it in the same good, seaworthy and clean condition as upon delivery, [Core] agrees to reimburse [McDonough] for said expense and to pay charter hire until date barge is returned to

the same good, seaworthy and clean condition."[16]

**1.   Cost of repairs.**

After Eschette performed his off-charter survey on behalf of McDonough, he solicited bids for the necessary repairs to the barge.[17]  The low bid was made by Bergeron Marine for $156,947.00, which was accepted by McDonough.  However, McDonough failed to deliver the KS-554 to Bergeron Marine for repairs, and the company eventually went out of business.[18]  Thus, new bids were solicited, which ranged from $260,700.00 to $548,238.00 as a result of market conditions.

Hanby testified that had McDonough delivered the KS-554 to Bergeron Marine in 2003, repairs could have been made for the original bid of $156,947.00.  The court accepts this testimony. However, Bergeron Marine's estimate included the $25,000.00[19] in damages to the bow related to one of the collisions during the

---

[16] Exhibit "1".

[17] The KS-554 was placed off-charter by McDonough on September 8, 2003.  Core, however, paid charter hire through September 16, 2003, because the barge was being repaired by a third party that had caused damage to the barge in a collision during the previous year.

[18] Hanby admitted at trial that the cost of making the repairs have since risen into the range of $260,700.00 to $548,238.00.

[19] Testimony of Webb; Testimony of Eschette.

pendency of the charter, which were repaired by Core before the barge was returned to McDonough.  The relevant damages, therefore, are $131,947.00.

**2.   Charter hire.**

Under the terms of the charter party, Core was required to pay "charter hire until date barge is returned to the same good, seaworthy and clean condition."[20]  McDonough, however, had an obligation to use reasonable diligence to reduce the damages arising from the breach of charter.  *Delta Steamship Lines, inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1003 (5th Cir. 1984).  Core paid charter hire through September 16, 2003.[21]  Bergeron Marine's bid was submitted to McDonough on September 23, 2003, with an estimated date of completion of 54 days.  Therefore, Core is responsible for charter hire from September 16, 2003 until 54 days after September 23, 2003.

## CONCLUSION

Under the charter party, Core is responsible to McDonough for damage to the KS-554 of $131,947.00, minus a credit of 40

---

[20] Exhibit "1".

[21] The KS-554 was placed off-charter by McDonough on September 8, 2003.  Core, however, paid charter hire through September 16, 2003, because the barge was being repaired by a third party that had caused damage to the barge in a collision during the previous year.

12

percent representing the portion of damages attributable to McDonough.

Additionally, Core is responsible for charter hire from September 16, 2003 until 54 days after September 23, 2003.

Because Core had a legitimate reason to deny McDonough's demand for all of the damages to the barge and because a substantial percentage of liability is attributable to both parties, an award for attorney fees as provided for in the charter party is inequitable and unreasonable.[22]  Each party is to bear its own costs.

New Orleans, Louisiana, this   31st   day of August, 2006.

_____
MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE

---

[22]See Cable Marine, Inc. v. M/V Trust Me II, 632 F.2d 1344, 1345 (5th Cir. 1980).